## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| GINNIE MCKNIGHT | : | |
| | : | |
| | : | |
| v. | : | Civil No. CCB-12-801 |
| | : | |
| | : | |
| NATIONWIDE BETTER HEALTH | : | |
| INSURANCE | : | |

## MEMORANDUM

Plaintiff Ginnie McKnight, proceeding pro se, filed this action alleging discriminatory treatment by her former employer, Nationwide Better Health Insurance ("Nationwide"),[1] in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act ("ADA"). She claims discriminatory treatment based on race, retaliatory discharge, a hostile work environment, and failure to accommodate a disability. Nationwide has moved for summary judgment. For the reasons stated below, Nationwide's motion will be granted.[2]

## BACKGROUND

McKnight began working for Nationwide in July 2007 as a Disease Management Coordinator. (Compl., ECF No. 1, at 2; Hendy Aff., ECF No. 2, ¶ 8.) McKnight, who is African American, initially reported to Kim Stokes, an African American woman. (Compl. at 3; Hendey Aff. ¶ 13.) After Stokes left the company, McKnight reported to Chanell Banks, also an African

---

[1] According to the defendant, Nationwide is actually Gates McDonald of Ohio, LLC.

[2] Nationwide also filed a motion to dismiss for failure to prosecute, (ECF No. 51), that will be denied as moot. In addition, McKnight filed a motion for default judgment on the grounds that Nationwide has failed to turn over a list of all employees who requested and had their usernames changed and because its attorney "mocked" her when he was deposing her. (ECF No. 53.) The court will construe her motion as one for sanctions under Federal Rule of Civil Procedure 37, and it will be denied.

American woman.  (Compl. at 3; Hendey Aff. ¶ 15.)

The evidence demonstrates, and McKnight does not dispute, that, soon after her hire, she began having attendance and tardiness problems.  Under Nationwide employment policies, employees that have at least four "chargeable occurrences" within three months or seven "chargeable occurrences" within twelve months may be placed on an "Attendance Improvement" plan.  (Section 12.1, Nationwide Policy Guide, Hendey Aff. Ex. A.)  "Chargeable occurrences" include absences occurring with less than 24 hours notice or that are unscheduled or not approved in advance.  (*Id.*)  The exception is leave protected by statutes like the Family and Medical Leave Act of 1993 ("the FMLA").  (*Id.*)  An employee with more than the allowable "chargeable occurrences" is placed on "Attendance Improvement" for a period of three to twelve months, as set by the employee's manager and Human Resources.  (*Id.*)  The employee's manager, working with Human Resources, also specifies the number of allowable absences the employee may have during her "Attendance Improvement" period.  (*Id.*)  If the employee does not comply with the terms of her "Attendance Improvement" plan, her employment is subject to termination at the time she violates the plan.  (*Id.*)

McKnight was first placed on a "Performance Improvement Plan" on January 7, 2008.  (Hendey Aff. Ex. C.)  She was provided with a warning notifying her that she had accumulated seven unplanned absences and had been late for work on fourteen days between the date of her hire in July 2007 and December 27, 2007.  (*Id.*)  Some of the absences and late arrivals occurred during the ninety-day probationary period during which new hires are to take no unplanned leave or ever be late.  (*Id.*)  The warning also noted that McKnight previously had received two verbal warnings regarding her attendance.  (*Id.*)  McKnight was placed on an additional sixty-day

2

probationary period during which she was expected to adhere to the attendance policy—which was reiterated in the warning. (*Id.*) McKnight noted in the "employee comments" section of the warning that she was absent due to illness related to her asthma and an emergency room visit on October 31, 2007, as well as "emergencies that weren't foreseen." (*Id.*) Kim Stokes, her supervisor, verified that McKnight had submitted a doctor's note for her visit to the emergency room on October 31, 2007, but had provided no documentation of illness for the other days she was absent. (*Id.*)

On her first performance review, administered on January 10, 2008, covering the period from her hire through December 31, 2007, McKnight received a rating of "did not meet" for a number of objectives, including attendance, professionalism, completing documentation, being available in the call queue as required, being a team player, and committing errors. (Hendey Aff. Ex. B at 2.) She also was reminded of Nationwide's attendance policy. (*Id.* at 5.)

McKnight's placement on Performance Improvement was renewed again, beginning February 12, 2008, for sixty days, due to continued lateness and unexcused absences. (Hendey Aff. Ex. D.) This warning noted that she had been leaving early, or not coming in at all, without first notifying her supervisors. (*Id.*) It warned McKnight that if she did not comply with the company's attendance policies during the sixty-day period, "consequences of further disciplinary action up to termination will be applied." (*Id.*)

McKnight received a "final written warning" on March 5, 2008, from her new supervisor, Chanell Banks. (Hendey Aff. Ex. E.) The warning documented new unplanned absences and noted that she had not complied with the plans on which she previously had been placed for improvement. (*Id.*) It further stated that McKnight could not incur any further attendance

infractions and that "[f]ailure to meet the minimum expectations outlined above will result in further disciplinary action up to and including termination of employment."  (*Id.*)  Without explanation, McKnight refused to sign the warning.  (*Id.*)

Despite being told the March 5 warning was the final one, McKnight was late on March 11 and 20, 2008.  (Hendey Aff. Ex. F.)  She was issued another warning and given another sixty days in which to have no "chargeable occurrences."  (*Id.*)  Although apparently improving for a time, McKnight took two unplanned absences in May and was late on several days in June 2008.  (Hendey Aff. Ex. G.)  As a result, she was issued another warning on July 3, 2008.  (*Id.*)

McKnight's attendance did not improve, and she was placed on Performance Improvement yet again on October 28, 2008, after several instances of tardiness in July, August, September, and October.[3]  (Hendey Aff. Ex. H.)  The written warning stated that McKnight could not be tardy at all during the next three months or she would face discharge.  (*Id.*)  McKnight signed the warning acknowledging that she had received a copy.  (*Id.*)  Although Nationwide told McKnight her employment would be terminated should she be late again, she was given another chance when she was late on November 10, 2008, receiving yet another Performance Improvement warning.[4]  (Hendey Aff. Ex. I.)  This warning stated that "**[a]ny** future instances of tardy within the next **three(3)** months will result in the termination of the associate's employment."  (*Id.* (emphasis in original).)

Despite yet another warning, and what appears to the court to be multiple "second" chances not required by the company's policy, McKnight was late again on January 9 and 12,

---

[3] Four of her absences in September and October were flagged as protected under the FMLA.  (*See* Hendey Aff. Ex. K.)

[4] According to Nationwide, McKnight was given another chance at that time because there were public transportation issues on November 10 that affected many employees.  (Hendey Aff. ¶ 32.)

2009. (Hendey Aff. ¶ 33; Hendey Aff. Ex. J.) Due to these additional instances of tardiness, McKnight's employment was terminated on January 14, 2009. (Hendey Aff. ¶ 33.)

McKnight's claims in this case center on a number of grievances she has with the username she was assigned by Nationwide, her inability to obtain a different work schedule and desk location, comments made by her coworkers, and her ultimate discharge. Because she has failed to provide evidence from which a reasonable factfinder could conclude Nationwide discriminated against her in violation of Title VII or the ADA, Nationwide is entitled to judgment in its favor.

## ANALYSIS

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). Whether a fact is material depends upon the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*,

721 F.3d 264, 283 (4th Cir. 2013) (citation omitted).  At the same time, the court must not yield

its obligation "to prevent factually unsupported claims and defenses from proceeding to trial."

*Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

## I.  Disparate Treatment

Title VII makes it illegal for an employer "to fail or refuse to hire or to discharge any

individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion,

sex, or national origin." 42 U.S.C. § 2000e–2(a).  In order to state a prima facie claim of

discrimination under Title VII, a plaintiff must plausibly allege: "(1) membership in a protected

class; (2) satisfactory job performance; (3) an adverse employment action; and (4) different

treatment from similarly situated employees outside the protected class." *Coleman v. Md. Court

of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

McKnight makes two claims of disparate treatment based on race.  First, she claims that

Nationwide treated her in a discriminatory manner by assigning her the employee username

"McKnigg," which McKnight claims is too close in form to a racial slur, and refusing to change

it when she requested, even though other white employees were able to change their usernames.

(Compl. at 2-3.)  Assuming without deciding that not providing a username or email address at

all may constitute an adverse employment action, the mere assigning of and refusal to change a

username or email, without more, does not.  McKnight does not allege she was unable to

perform her job functions with her assigned username or that the username denied her

opportunities for promotion, affected her compensation, or otherwise affected her position with

the company.  *See Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004)

6

(noting that adverse employment actions include anything that affects the terms, conditions, or benefits of employment).  Because she has provided no evidence of an adverse employment action, McKnight cannot make a prima facie showing of disparate treatment.

Even assuming McKnight had made a prima facie showing, Nationwide offers a nondiscriminatory reason for the assignment of the username and the failure to change it.  *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (explaining the employer can rebut the prima facie case with a "legitimate, nondiscriminatory reason for the employment action").  Upon her hire, as with all other employees, the computer system automatically assigned McKnight a username comprised of the first four to six letters of her last name and the first initial of her first name.  (Hendey Aff. ¶¶ 41-43.)  This resulted in a username of "mcknigg."  (*Id.*)  To change the username, requests for name changes could be submitted via a form to the IT Help Desk in Columbus, Ohio.  (*Id.*)  According to Nationwide, there is no record of McKnight ever complaining about her username to management or submitting a request to the IT Help Desk asking for it to be changed.  (Hendey Aff. ¶ 44.)  Even if McKnight did complain to her supervisors and IT, as she claims, she has failed to provide any evidence that the nondiscriminatory reason provided by Nationwide for its conduct is pretextual.  *See Diamond*, 416 F.3d at 318 (explaining that, to survive summary judgment, the employee must demonstrate the employer's permissible reason for an adverse employment action is a pretext for discrimination).  At most she only has provided evidence that her supervisors and the individuals in IT failed to follow up on the matter, with no evidence of racial motivations.  Although the court can understand McKnight's concerns regarding her username, she has provided no evidence from which to conclude Nationwide's conduct constituted discriminatory treatment in

7

violation of Title VII.

McKnight also claims Nationwide discriminated against her when it failed to give her the daytime shift, instead giving it to a white employee, Kristen Hooks.  (Compl. at 4-5.)  The evidence demonstrates, and there is nothing to dispute, that Hooks actually was hired into a separate position.  (*See* Hendey Aff. ¶ 39; Hendey Aff. Ex. S (listing the applicants for the position that Hooks obtained).)  To demonstrate discrimination in hiring or promotion, McKnight initially must demonstrate that she applied for a specific position and that she was qualified for the position.  *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir. 2004).  McKnight did not apply for Hook's position, (Hendey Aff. Ex. S)—the evidence only demonstrates that she asked in an email to change departments—nor was she eligible to apply for new positions, receive a salary increase, or obtain a promotion due to her placement on a Performance Improvement Plan, (*see* Hendey Aff. Exs. H, I.).  She thus cannot demonstrate discriminatory hiring or promotion by Nationwide.[5]  *See Williams*, 370 F.3d at 430 (noting that merely expressing interest in obtaining a different position is not sufficient to state a prima facie case of discrimination where the company has a formal system for applying for vacancies and the employee has failed to apply).

## II.  Hostile Work Environment

McKnight claims she was subjected to a hostile work environment based on her race.[6]  (Compl. at 3.)  To establish a hostile work environment claim under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome

---

[5] To the extent McKnight claims being placed on the daytime shift was guaranteed to her based on seniority, she has provided no evidence that Nationwide used such a system.
[6] The court notes that McKnight also claims she was subjected to a hostile work environment on the basis of a disability—her asthma.  Because she has failed to provide evidence from which to conclude she had a disability as defined by the ADA, *see* Part IV, however, she cannot sustain such a claim.  *See Rohan v. Networks Presentations LLC*, 375 F.3d 266, 272-273 (4th Cir. 2004).

harassment; (3) the harassment was based on her protected status; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment; and (5) some factual basis exists to impute liability for the harassment to the employer. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183–84 (4th Cir. 2001).

McKnight has failed to provide sufficient evidence of a hostile work environment.  First, she has not demonstrated that any of the comments of which she complains were based on her race.  (*See, e.g.*, Hendey Aff. Ex. M (stating that a coworker referred to McKnight's neighborhood as being "where the 'queer' folks live"); McKnight Dep. Vol. 1, Gallagher Aff. Ex. A, ECF No. 52-3, at 295:12-298:17 (noting that a coworker made a joke to another employee in McKnight's presence, saying, "Which do you prefer to sit around you, someone that is loud like me, or someone sick all the time?").)  Harassment that McKnight may have incurred unrelated to her protected status is not actionable under Title VII.  *See Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination." (internal quotation marks omitted) (citation omitted)).

Further, to the extent any comments related to her username can be deemed harassment based on her race, there is no evidence from which to conclude they were sufficiently severe or pervasive to alter the conditions of her employment.  To establish a hostile work environment claim, a plaintiff must show not only that she subjectively believed her workplace environment was hostile, but also that a reasonable person in the plaintiff's position would have found the environment objectively hostile.  *Equal Emp't Opportunity Comm'n v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008).  To determine whether a reasonable person would perceive

workplace conduct to be severe and pervasive, the court considers a number of factors, such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (internal quotation marks and citation omitted).  The workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

McKnight is only able to point to a few comments that she believes were racially hostile based on her username.  On one occasion, a coworker yelled the username as a racial slur from the copy room while apparently trying to find who had printed some documents—each document printed with a cover page identifying the username of the employee that printed it.  (Compl. at 3; McKnight Dep. Vol. 2, Gallagher Aff. Ex. 2, ECF No. 52-3, at 589:6-14.)  In addition, McKnight's second supervisor, Chanell Banks, repeated the term back to McKnight in meetings concerning her desire to change it.[7]  (McKnight Dep. Vol. 2 at 597:1-598:20 (testifying that Banks stated that it was a "crazy" username when McKnight brought the issue up with Banks).)  Any reference to the username by Banks—repeating the term while discussing McKnight's desire to change it—is not objectively hostile, leaving one comment by a coworker in the one and one-half years McKnight worked for Nationwide.  Although the court strongly condemns the

---

[7] At her deposition, McKnight also testified that a coworker made jokes about her username being close in form to a racial slur over twenty times.  (McKnight Dep. Vol. 2 at 585:14-587:17, 588:13-19.)  Although she did not appreciate the joke, however, McKnight testified that she did not perceive the coworker's comments to be racially hostile.  (*Id.* at 591:14-592:12.)  The coworker also told McKnight that the username was "foul" and "crazy" and that she could not believe Nationwide had assigned it to her.  (*Id.* at 587:10-15.)  Because McKnight did not subjectively view the comments as hostile they cannot contribute to any hostile work environment claim.

10

use of such slurs in any setting, its use once by one coworker cannot provide evidence of pervasive harassment.  *See Sunbelt Rentals*, 521 F.3d at 315 (noting that although Title VII "surely prohibits an employment atmosphere that is 'permeated with discriminatory intimidation, ridicule, and insult,' it is equally clear that Title VII does not establish a 'general civility code for the American workplace.'" (internal citations omitted).)  Nationwide is entitled to summary judgment on McKnight's hostile work environment claims.[8]

### III. Retaliation

McKnight claims she was discharged in retaliation for filing a complaint of a hostile work environment.  (Compl. at 5.)  To state a claim for retaliatory termination, McKnight must establish that 1) she engaged in protected activity, 2) an adverse employment action was taken against her, and 3) a causal link exists between the protected activity and the adverse employment action.  *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004) (Title VII); *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 706 (4th Cir. 2001) (ADA).  McKnight claims she was fired after submitting a "final complaint of a hostile work environment" on January 7, 2009. (Compl. at 5.)  It appears she is referring to an email she sent to Laura Rossi on January 9 complaining about an email she received from Daniel Marecki, another supervisor in McKnight's department, on January 7.  (*See* Hendey Aff. Ex. R.)  In her email to Rossi, McKnight complains that Marecki directed her to complete a task with a "rude tone of voice," sent an email that was "rude and condescending" and "taunting," and was dishonest about his discussions with other supervisors.  She also states that she felt his behavior was "a personal

---

[8] The court notes that in some of her emails to Nationwide management McKnight refers to harassment she experienced when supervisors critiqued her work product or productivity.  (*See, e.g.*, Hendey Aff. Ex. N.)  To the extent she is claiming a hostile work environment on the basis of such incidents, she cannot support a claim.  *See Webster v. Johnson*, 126 F. App'x 583, 587-88 (4th Cir. 2005) (finding that poor performance evaluations, without evidence they were racially motivated, does not provide evidence of a racially hostile work environment).

attack on my character." (*Id.*)

McKnight's email is not protected activity, and she thus has failed to establish a prima facie case of retaliatory termination. Although an employer may not take adverse employment action against an employee for opposing discrimination in the workplace,[9] *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998), there is nothing in the record from which to conclude that McKnight ever raised concerns about discrimination, *see Sajadian v. Am. Red Cross*, 202 F.3d 260 (table), 1999 WL 1111455 *1 (4th Cir. 1999) (finding an employee had not engaged in protected activity where there was no evidence her employer was aware that her complaints were based on an allegation of discrimination); *Ruffner v. MD OMG EMP LLC*, 2012 WL 3542019, at *3 (D. Md. 2012) ("The employee must, at least implicitly or indirectly, complain about or oppose prohibited discrimination.").[10] She thus has failed to establish even the first element of a retaliatory discharge claim.

Even assuming McKnight has established a prima facie case of retaliation, Nationwide had a nondiscriminatory reason for terminating her employment. The record demonstrates that she was repeatedly tardy or absent in violation of Nationwide's attendance policy after several warnings and second chances, and that she ultimately was discharged on that basis. She has done nothing to demonstrate such a reason is pretextual.[11]

### IV. Failure to Accommodate

Finally, McKnight claims Nationwide failed to provide a reasonable accommodation for

---

[9] An employer also is barred from taking adverse action against an employee for participating in an ongoing investigation or proceeding under Title VII. *Laughlin*, 149 F.3d at 259. There is no evidence, and McKnight does not appear to claim, that she was participating in an investigation or proceeding.

[10] Unpublished cases are cited only for the soundness of their reasoning not for any precedential value.

[11] To the extent McKnight is claiming she was discharged not in retaliation for opposing discriminatory conduct but on the basis of her race and/or any disability, her claim fails for the same reasons explained earlier in the memorandum.

her claimed disability—asthma—by failing to move her desk location away from an air vent and

failing to grant her two requests to change departments.  (Compl. at 4.)  To prove a failure to

accommodate claim, a plaintiff must show: "that he was an individual who had a disability

within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that

with reasonable accommodation he could perform the essential functions of the position . . .; and

(4) that the [employer] refused to make such accommodations." *Rhoads v. Fed. Deposit Ins.

Corp.,* 257 F.3d 373, 387 n.11 (4th Cir.2001).  McKnight has failed to provide evidence of a

disability within the meaning of the ADA and thus Nationwide is entitled to summary judgment

on the issue.

The extent of the evidence McKnight offers to demonstrate she had a "disability" is as

follows: McKnight states in her complaint that her asthma worsened in late 2007 due to the

"stress of the hostile work environment and the location of [her] work station."  (Compl. at 4.)

She states that in 2008 she became "increasingly ill," had an asthma attack at home on

September 23, 2008, and continued to have intermittent absences due to asthma.  (*Id.*)  In

October 2008, she submitted an updated Federal Certification of Health Care Provider ("CHCP")

form to Nationwide in order to classify some of her absences as FMLA-protected.  (*Id.*; Hendey

Aff. ¶¶ 34, 35; Hendey Aff. Ex. L.)  On the CHCP, McKnight's primary care physician marked

her asthma under the category of "Chronic Conditions Requiring Treatments."  (Hendey Aff. Ex.

L at 1; Pl.'s Opp'n Ex. C, ECF No. 56, at 1, 4.)  The doctor stated that her asthma would be a

life-long condition and that McKnight would need to take time off of work about one day every

three months for a year to attend follow-up visits.  (Hendey Aff. Ex. L at 1.)  The doctor also

stated that McKnight could not work during asthma exacerbations, but did not describe what

might lead to exacerbations.  (*Id.* at 2.)

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  To prove she is actually disabled or has a record of impairment, McKnight must demonstrate that her asthma substantially limited one or more major life activities.  Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  Although unclear from her filings, McKnight appears to allege that her ability to work or breathe was substantially impaired.  Her evidence is entirely insufficient, however, to prove substantial impairment.

"[T]o be substantially limited in the major life activity of working, 'one must be precluded from more than one type of job, a specialized job, or a particular job of choice.'" *Pollard v. High's of Balt., Inc.*, 281 F.3d 462, 471 (4th Cir. 2002) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491–92 (1999)).  A plaintiff must show she cannot work "in a broad range of jobs."  *Id.*  There is no evidence from which to conclude McKnight is precluded from working in any job due to her asthma.  That she may have needed to be absent a few times over the year for follow-up visits regarding her asthma, (Hendey Aff. Ex. L at 1), does not mean she was precluded from working.  *See Taylor v. Rite Aid Corp.*, -- F. Supp. 2d --, 2014 WL 320214, at *7 (D. Md. Jan. 27, 2014) (holding that a plaintiff had failed to demonstrate a substantial limitation where she had shown only that her condition negatively affected her job performance sometimes).  In addition, McKnight has offered no evidence that her asthma

substantially limited her breathing.  That she had asthma is not enough alone.  *See Tangires v. Johns Hopkins Hosp.*, 79 F. Supp. 2d 587, 594-95 (D. Md. 2000) (noting that a plaintiff must prove that asthma was a physical or mental impairment *and* that her asthma substantially limited her breathing).

McKnight also has failed to demonstrate she was regarded as disabled as the record is completely devoid of evidence that Nationwide mistakenly believed either that she had a physical impairment that substantially limited a major life activity or that an actual, nonlimiting impairment she had substantially limited a major life activity.  *See Taylor*, at *8 (articulating the standard for being regarded as disabled) (citations omitted).  The fact that Nationwide was aware McKnight had asthma, and as a result took intermittent FMLA leave, is insufficient.  *Id.* (citing *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 278 (4th Cir. 2004); *Haulbrook*, 252 F.3d at 703).

Because McKnight has failed to demonstrate she had a disability as defined by the ADA, Nationwide is entitled to summary judgment on her claim of failure to accommodate.

## CONCLUSION

For the reasons stated above, Nationwide's motion for summary judgment will be granted.  A separate order follows.


May 29, 2014                                    /s/
Date                                    Catherine C. Blake
                                    United States District Judge

15